UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| VICTORIA L. SEREDNYJ, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 2:08-CV-4 RM |
| | ) | |
| BEVERLY HEALTHCARE LLC, | ) | |
| | ) | |
| Defendants | ) | |

OPINION AND ORDER

Victoria Serednyj was the activity director at Beverly Healthcare's Golden Living nursing home in Valparaiso, Indiana when she became pregnant in early January 2007. At the end of February 2007 she began to experience complications with her pregnancy and her doctor placed her on bed rest for just under two weeks. At the end of her bed rest her doctor placed her on light duty restrictions. Ms. Serednyj asked for accommodations from Beverly Healthcare, but Beverly Healthcare denied these requests under its modified work policy. Ms. Serednyj didn't qualify for FMLA leave and her employment was terminated. Ms. Serednyj sues for pregnancy discrimination under Title VII as modified by the Pregnancy Discrimination Act, and under the Americans with Disabilities Act for Beverly Healthcare's failure to accommodate, and brings a retaliation claim against Beverly Healthcare.

Beverly Healthcare moved for summary judgment on all claims, and the court heard oral argument on April 12. For the reasons that follow, the court grants Beverly Healthcare's summary judgment motion.

Ms. Serednyj worked for Beverly Healthcare for three distinct periods. She worked as a certified nursing assistant (CNA) from February 2002 to September 2002 and from October 2003 to July 2005. She quit her job voluntarily both times. Dawn Mount, the Golden Living facility's executive director, hired Ms. Serednyj as activity director on August 11, 2006.

The activity director's duties included planning, implementing and participating in activities for residents at the nursing home facility. As activity director, Ms. Serednyj attended morning meetings, conducted exercise classes, planned arts and crafts, planned bingo, planned excursions outside the facility and coordinated the entertainment of residents. She also held one-on-one therapy sessions with residents, which often consisted of holding residents' hands or helping them write letters. There was more or less one activity per day. Ms. Serednyj supervised the assistant activity director, who conducted evening activities and worked on Ms. Serednyj's off days.

Ms. Serednyj had to perform certain physically strenuous functions, but other Beverly Healthcare employees always helped her with these functions out of a spirit of teamwork (and not because she couldn't perform these functions herself). Helpers included facility Executive Director Dawn Mount, "burly" physical therapist assistant Eric Christe, and available CNAs.

Ms. Serednyj was responsible for rearranging dining room tables for activities and later putting them back in order. This required bringing tables up

from the basement at times, but only Mr. Christe could move those tables by himself and the physical therapy department generally would help move the tables. This took up a small part—roughly five to ten minutes per day—of Ms. Serendyj's day.

Ms. Serednyj was responsible for transporting residents to and from the activities, pushing some in wheelchairs and others in much heavier "geri chairs." She usually transported only two or three of the residents, and the other seven or eight attendees would either transport themselves or be assisted to the activity by CNAs and other available employees. Mr. Christe and others transported certain obese residents. This also took up a small part—roughly five to ten minutes per day—of Ms. Serendyj's day.

Ms. Serednyj was responsible for shopping for these activities as often as needed, usually every two weeks or so, which involved pushing carts and lifting groceries into and out of her own vehicle. Soda was a heavy item for which she normally shopped.

Finally, Ms. Serednyj was responsible for setting up and maintaining the activity calendar, which covered a full wall with one page printed out per day of the month. She had to stand on a stool and reach up high to post the first week of the calendar, but only had to do so once a month. The assistant activity director assisted with all these job functions. The parties don't dispute the activity director's job requirements, but they do dispute which of these requirements were "essential" job functions.

Ms. Serednyj points out that the job description for activity director has a heading "Essential Functions" in bold, underlined, and all caps. Beneath this heading it lists (1) Unit Supervision, (2) Plan Recreation Services, (3) Facility Support Function, (4) Resident's Council, and (5) Staff Development Functions. It doesn't say anything in this list about transporting patients, doing the activity calendar, or lifting shopping bags. Under the "Qualifications" heading, also in bold, underlined, and all caps, the description says nothing about transporting patients, doing the activity calendar or lifting shopping bags. Under the "Other Functions" heading, also in bold, underlined, and all caps, the description lists (1) Residents Rights and Positive Relationship Function, (2) Quality Improvement Function, (3) Code of Conduct, (4) Other Duties. Again, nothing about physical requirements.

Beverly Healthcare responds that there is a general physical and sensory requirements paragraph in the job description that, in their view, applies to the job description as a whole. This paragraph says "walking, reaching, climbing, bending, lifting, grasping, fine hand coordination, pushing and pulling, ability to read and write, ability to communicate with residents and personnel, and ability to remain calm in emergency situations and when handling multiple tasks."

On December 14, 2006, Ms. Serednyj learned she was pregnant, but she suffered a miscarriage days later. On January 7, 2007 she learned she was pregnant again (the second pregnancy might have been a twin from the first pregnancy rather than a new pregnancy). Shortly after learning of the second

pregnancy, Ms. Serednyj informed Ms. Mount, her supervisor, and others at Beverly Healthcare that she was pregnant. Ms. Mount congratulated Ms. Serednyj and Ms. Serednyj continued to work her normal schedule with her normal job duties, including the physical duties already noted.

Ms. Serednyj began having complications with her pregnancy toward the end of February. She was spotting and cramping. Ms. Serednyj went to the hospital and was attended to by Dr. Wallace Sherritt because her regular physician was on vacation. Ms. Serednyj learned that her progesterone levels were low, she had shearing of the uterus, and there was bleeding behind the placenta. She likely would suffer another miscarriage if this weren't addressed immediately. She was prescribed progesterone suppositories twice a day and Dr. Sherritt told her not to perform strenuous activities.

Ms. Serednyj explained her complications to Ms. Mount and what Dr. Sherritt had said about strenuous activities. Ms. Serednyj believes she didn't come to work the day after her hospital visit, but worked a few days thereafter. Within a couple days, Ms. Mount asked Ms. Serednyj for further explanation about what she could and couldn't do, and Ms. Serednyj got a note from Dr. Sherritt dated February 27, 2007 and presented it to Ms. Mount. The note states,

> She has explained her responsibilities that pertain to her work and she has been advised that she is not to participate in her usual work load. If she cannot perform duties that are of a limited nature then she needs to stay off of work until she can be re-evaluated by Dr. Wiese [her normal physician] upon his return next week.
> Failure to do so could jeopardize this pregnancy.

The restrictions meant Ms. Serednyj couldn't move tables around, couldn't push heavier patients, and couldn't decorate the top of the activity board. Ms. Serednyj says her conversation with Ms. Mount about this note involved a request to be excused from these activities. She told Ms. Mount "[t]hat I would be able to perform the essential job functions, but I would just need a little bit of help moving tables around and pushing, you know, heavier people to and from the main dining room, and people were more than willing to help me."

Also in this conversation, Ms. Mount explained that Beverly Healthcare's policy on modified duty is to provide light duty only for work-related injuries. Beverly Healthcare's HR-305 policy states, "The Company only provides one type of restricted or limited duty to employees with non-work related injuries or conditions," which is accommodated duty "as one form of reasonable accommodation under the Americans with Disabilities Act (ADA) or comparable state law, where medically necessary for qualified individuals with disabilities to perform essential job functions." The policy states in boldface, "No other restricted or limited duty is permitted for non-work related injuries or conditions." Ms. Mount also explained that Ms. Serednyj hadn't worked long enough to qualify for FMLA. The parties dispute whether Ms. Mount explained Beverly Healthcare's own leave of absence policy and provided a leave of absence form to Ms. Serednyj.[1]

_____

[1] At first Ms. Serednyj admitted that Ms. Mount explained the policy to her and provided the form to her. Serednyj Dep. at 125. Later in her deposition she appeared to backtrack and suggest she was never given this form. Serednyj Dep. at 154-55:

Q. Okay. And the fact is Ms. Mount at your very first meeting with her in February gave you a leave of absence form, didn't she?

Ms. Serednyj didn't work any more from that point. As Ms. Serednyj testified, "That was under Dawn's discretion. That was not his [her doctor's] discretion because I note this letter right here said that if I cannot perform duties of the [sic] limited nature, then I need to stay off work until I could be reevaluated. Dawn said she could not have me in the building with this—with what's stated in this letter until I go back to see Dr. Wiese and I am released back to full duty work." Serednyj Dep. at 129-130.

On March 1, Dr. Sherritt faxed a letter to Ms. Mount. He wrote, "After reviewing your form and considering this patient's situation I have decided that in her best interest I cannot give my permission for her to continue working in any capacity." Dr. Sherritt further indicated that Ms. Serednyj's normal physician, Dr. Wiese, would return soon and he deferred to Dr. Wiese's judgment on the matter.

---

A. I don't-possibly. Like I said, I don't remember.
Q. Okay. Your testimony is as you sit here today, you don't remember one way or the other whether she gave you that form?
A. I-I don't remember.
Q. Okay.
A. And if she did, I-I don't know why it wasn't filled out or why it wasn't turned in. I don't remember.

Ms. Serednyj then testified that if she was offered a leave of absence she would have taken it. Serednyj Dep. at 235. Ms. Serednyj further testified, under examination by her own attorney, that she wanted an accommodation not medical leave. Serednyj Dep. at 279:
Q: Were you asking for an accommodation or further medical leave?
       MR. GLASSMAN: Objection.
       THE WITNESS:
A: An accommodation.
       MS. HEARN:
Q: So would there be any reason for you to fill out the company leave forms then if you were -
       MR. GLASSMAN: Objection.
       MS. HEARN:
Q: --just asking for accommodation?
A: No.

7

Ms. Serednyj saw Dr. Wiese on March 6, and he signed a small form titled "Disability Certificate" that he backdated to state that Ms. Serednyj was totally incapacitated from March 2 to March 14, and still was unable to return to work. Ms. Serednyj presented this to Ms. Mount. She told Ms. Mount that she was to see Dr. Wiese again on the 13th and Ms. Mount told her that if she couldn't return to work on the 14th without restrictions she would have to "let her go."

On either March 11 or March 13, Ms. Serednyj saw Dr. Wiese again and he wrote a note saying "light duty or unable to work until further notice." Ms. Serednyj presented this note to Ms. Mount on March 13. Ms. Mount reiterated the company's policy that it didn't provide modified work to employees with non work-related injuries or conditions. Ms. Mount again told Ms. Serednyj that she hadn't worked enough hours in the last year to qualify for FMLA leave, but didn't explain Beverly Healthcare's own leave of absence policy at this last meeting. Ms. Serednyj testified, "She—at that point, she did not say anything about a leave of absence. She told me that because I was—I was on light duty and I could not come back on full duty, that she was going to have to let me go. . . . She had no choice. She had to let me go. She said she already consulted with whoever the higher-up was, and they gave her the go-ahead." Serednyj Dep. At 141. Ms. Serednyj's employment ended on March 13, 2007. Ms. Serednyj testified that this meeting "ended on a good note." Beverly Healthcare employees take the position in their depositions that Ms. Serednyj quit. Ms. Serednyj takes the position that she was fired. Beverly Healthcare's briefing avoids the issue by arguing that it is

8

immaterial whether Ms. Serednyj quit or was fired. For purposes of summary judgment, the court accept Ms. Serednyj's version that she was fired.

Ms. Serednyj wasn't placed on progressive discipline, and nothing indicates Beverly Healthcare was less than satisfied with Ms. Serednyj's job performance up until these events.

Ms. Serednyj contacted an attorney recommended by Mr. Christe. Ms. Serednyj's attorney drafted a letter, which Ms. Serednyj signed, formally requesting accommodation pursuant to the ADA and the PDA. Ms. Serednyj dropped off this letter on March 21. Ms. Mount called Ms. Serednyj to say she got the note and would look into the situation again. Ms. Mount followed Beverly Healthcare's policy requiring she contact Division Manager of Human Resources Connie Rebey. After this discussion, Ms. Mount called Ms. Serednyj on or around March 26 to tell her again that she wasn't eligible for light duty under Beverly Healthcare's policy.

On April 10, Beverly Healthcare filled out an Earning Information Request form for Ms. Serednyj for Indiana state welfare. Beverly Healthcare indicated on the form that Ms. Serednyj was "fired" from her job. On April 12, Ms. Serednyj filed a charge of discrimination with the EEOC.

Ms. Serednyj went on to give birth, get another job, and work through a second pregnancy without restrictions. Ms. Serednyj's doctor never provided a written note removing the restrictions during her first pregnancy, but he orally

told her in June 2007 that she could begin exercising again, which Ms. Serednyj

did. Ms. Serednyj testified,

> Q: Okay. And how long did that restriction remain in place?
> A: I'm trying to remember exactly how long that was. I don't remember what month it was. All I remember is that by the fifth month, I was exercising.
> Q: Okay.
> A: I started exercising.
> Q: So it was—that restriction was lifted?
> A: Yeah. He gave me the go-ahead to be able to start exercising around the fifth month.
> Q: And which would—you learned you were pregnant in January?
> A: Right, yeah.
> Q: And so when would the fifth month of your pregnancy have been?
> A: June.
> Q: Okay. So by June, is it your testimony that you did not have any restrictions?
> A: Right, correct.
> Q: Okay. So it was just temporary then from March until June?
> A: Correct.
> Q: Okay. Just so I'm clear and the record is clear, the restrictions that you claim existed in March were temporary in nature, correct?
> A: Correct.
> Q: And that by June, those restrictions no longer existed, correct?
> A: Correct.
> Q: And the restrictions that were in place for that temporary period of time were due to your pregnancy, correct?
> A: Correct.

## II

In reviewing Beverly Healthcare's summary judgment motion, the court

doesn't weigh the evidence but rather accepts the evidence Ms. Serednyj has

presented and construes all facts, and draws all reasonable inferences from those facts, in favor of Serednyj, the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Clay v. Holy Cross Hospital</u>, 253 F.3d 1000, 1005 (7th Cir. 2001). Courts assess motions for summary judgment using only evidence admissible at trial. <u>Gunville v. Walker</u>, 583 F.3d 979, 985 (7th Cir. 2009).

Judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "material" if it might affect the outcome of the litigation under the governing law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Disputes over material facts are "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> The evidentiary standard is the same that would apply at a trial on the merits, so Ms. Serednyj must present enough competent evidence in rebuttal of Beverly Healthcare's motion that a reasonable jury could find by a preponderance of the evidence that Ms. Serednyj has prevailed on her claims. *See* <u>id.</u> at 252; <u>Butts v. Aurora Health Care, Inc.</u>, 387 F.3d 921, 924 (7th Cir. 2004).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The nonmovant must provide evidence beyond the pleadings

11

setting "forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Summary judgment is the time when a plaintiff must come forward with enough evidence to convince a trier of fact of her version of the facts: as the court of appeals has put it, it is the "put up or shut up" moment of the lawsuit. Johnson v. Cambridge Industries, Inc., 325 F.3d 892, 901 (7th Cir. 2003).

<br>

III

A

The court treats Ms. Serednyj's Title VII and PDA claims together: they involve the same analysis because pregnancy is a proxy for gender, *see* Griffin v. Sisters of Saint Francis, Inc., 489 F.3d 838, 842-843 (7th Cir. 2007), and Ms. Serednyj's argument doesn't distinguish these claims.

Ms. Serednyj doesn't argue that Beverly Healthcare fired her because she was pregnant. She argues that she requested and should have received accommodations based on restrictions her doctor placed on her. Title VII, as amended by the PDA, doesn't mandate such accommodations. The PDA amended Title VII to define sex discrimination as including discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The PDA goes on to require that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." Id. This prohibition on pregnancy discrimination

means that "discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex," Griffin v. Sisters of Saint Francis, Inc., 489 F.3d at 843. An adverse employment decision constitutes unlawful discrimination whenever pregnancy is a motivating factor for the decision. 42 U.S.C. § 2000e-2(m); Maldonado v. U.S. Bank, 186 F.3d 759, 763 (7th Cir. 1999).

For our purposes, the import of this prohibition on pregnancy discrimination is that an employer isn't required to make accommodations for pregnant employees under the PDA and Title VII unless the employer makes accommodations for similarly situated employees who aren't pregnant. *See* Dormeyer v. Comerica Bank-Illinois, 223 F.3d 579, 583 (7th Cir. 2000) (noting PDA doesn't "protect a pregnant employee from being discharged for being absent from work even if her absence is due to pregnancy or to complications of pregnancy, unless the absences of nonpregnant employees are overlooked"). The PDA doesn't require employers to make it easier for pregnant women to work, and employers can treat pregnant women as badly as they treat similarly situated nonpregnant employees. Troupe v. May Department Stores Co., 20 F.3d 734, 738 (7th Cir. 1994). The PDA requires employers to ignore an employee's pregnancy status and thereafter treat like employees alike. *See* Troupe v. May Department Stores Co., 20 F.3d at 738.

Employers must ignore an employee's pregnancy, but they aren't required to ignore an employee's inability to meet her job requirements. There is a legal difference between firing an employee because she is pregnant, and firing an

employee because an illness prevents her from performing her job satisfactorily, even if that illness is causally connected to her pregnancy. *See* Troupe v. May Department Stores Co., 20 F.3d 734, 737 (7th Cir. 1994) (holding PDA did not require employer to treat pregnant employee suffering from unusually severe morning sickness any better than any other employee equally tardy for some other health reason).

Beverly Healthcare's policy HR-305 stated that the company doesn't provide restricted or limited duty to employees with non-work related injuries or conditions unless the employee was a qualified individual with a disability under the Americans with Disabilities Act. This policy is pregnancy-blind, which is all that the PDA and Title VII require, and so is lawful on its face. *See* Spivey v. Beverly Healthcare Enterprises, Inc., 196 F.3d 1309, 1312-1313 (11th Cir. 1999) (finding same policy from same defendant valid under the PDA and citing Troupe v. May Department Stores, 20 F.3d at 738)); *see also* Reeves v. Swift Transportation Company, Inc., 446 F.3d 637, 641 (6th Cir. 2006) (finding similar pregnancy-blind policy valid); Urbano v. Continental Airlines, 138 F.3d 204, 206 (5th Cir. 1998) (same).

Ms. Serednyj also argues that the policy was used against her as a disguise for pregnancy discrimination. The methods for showing such discrimination under the PDA are similar to other Title VII claims, and involve the "direct" and "indirect" methods of proof. There appears to be some overlap between these methods of proof, shown by the parties' dispute over where circumstantial evidence fits into

the analysis, but "the bottom line is the same: a plaintiff must show a discriminatory motive either with some evidence that is incriminating in itself [direct method] or by ruling out other plausible motives for the adverse employment action [indirect method]." Maldonado v. U.S. Bank, 186 F.3d at 763.

1

There are two types of permissible evidence under the direct method of proof. "First, there is direct evidence, or evidence that, if believed by the trier of fact, would prove the fact in question without reliance on inference or presumption." Venturelli v. ARC Community Services, Inc., 350 F.3d 592, 599 (7th Cir. 2003) (quotation removed). This essentially requires something akin to an admission by the decisionmaker that her actions were based on the prohibited animus. Id. "The second type of evidence permitted under the direct method is circumstantial evidence, or evidence that allows a jury to infer intentional discrimination by the decisionmaker." Id. A decisionmaker is the person responsible for the contested decision. Id. at 600. Circumstantial evidence must provide "a convincing mosaic" that "allows a jury to infer intentional discrimination by the decisionmaker." Rhodes v. Ill. Dept. of Transp., 359 F.3d 498, 504 (7th Cir. 2004) (quoting Troupe v. May Dept. Stores Co., 20 F.3d at 737). The circumstantial evidence must point directly to a discriminatory reason for the employer's action. Rhodes v. Ill. Dept. of Transp., 359 F.3d at 504.

There are three categories of circumstantial evidence under the direct approach, each of which is sufficient by itself. Venturelli v. ARC Community Services, Inc., 350 F.3d 592, 601 (7th Cir. 2003) (citing Troupe v. May Dept. Stores Co., 20 F.3d at 736).

> The first category consists of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." The second type requires a showing that the employer systematically treated other, similarly situated, non-pregnant employees better. The third type is evidence that the plaintiff was qualified for the position in question but passed over in favor of a person not having the forbidden characteristic and that the employer's stated reason for its decision is "unworthy of belief, a mere pretext for discrimination."

Venturelli v. ARC Community Services, Inc., 350 F.3d at 601 (quoting Troupe v. May Dept. Stores Co., 20 F.3d at 736). The third category is substantially the same as evidence required under the indirect method. Venturelli v. ARC Community Services, Inc., 350 F.3d at 601 (quotation omitted).

Ms. Serednyj's claim can't survive summary judgment under the direct method because direct proof of discrimination is lacking. Ms. Serednyj testified that Executive Director Mount congratulated her when she announced she was pregnant. Ms. Serednyj worked for the next several weeks without interruption or any hint of a problem from herself or her employer, fulfilling all of her usual job duties. Finally, Ms. Serednyj testified that she knew of employees who had worked at Beverly Healthcare through their pregnancies and went back to work at Beverly

Healthcare after giving birth. This is no admission from Beverly Healthcare that it fired her because she was pregnant.

Ms. Serednyj argues that a convincing mosaic of circumstantial evidence exists because she received what she calls "accommodations" before becoming pregnant and suffering pregnancy complications. Mr. Christe, Ms. Mount, and other employees would chip in and help her out, moving tables, transporting patients to activities, and the like. Once her doctor placed her on restrictions, Beverly Healthcare suddenly refused to accommodate her.

Ms. Serednyj was helped before her complications, but wasn't "accommodated" as the law uses that word. She only requested what she had before, but there is a difference. Before, people helped out voluntarily. With her complications and restrictions, she was asking that employees be required to perform some of her job requirements whenever she needed it. Before, she might have had to make do on her own every now and then to get the job done. After her restrictions, she asked to be excused from some of her job requirements and that others' work days be rearranged to accommodate her.

This isn't circumstantial evidence of discrimination against Ms. Serednyj so much as it is direct evidence that Beverly Healthcare was applying its modified work policy to her.

2

The indirect method of proof requires a plaintiff to set forth a *prima facie* case of discrimination and then involves burden-shifting steps, as first outlined in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-804 (1973). To set out a *prima facie* case of discrimination, Ms. Serednyj must show (1) she was pregnant and her employer knew she was pregnant; (2) she was performing her duties satisfactorily; (3) she was fired; and (4) similarly situated employees who weren't pregnant were treated more favorably. <u>Griffin v. Sisters of Saint Francis, Inc.</u>, 489 F.3d at 844 (citing <u>Clay v. Holy Cross Hosp.</u>, 253 F.3d 1000, 1005 (7th Cir. 2001)).

Once a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for firing the plaintiff. If such a reason is given, the plaintiff can defeat a summary judgment motion only by showing that the reason is pretext for intentional discrimination. <u>Griffin v. Sisters of Saint Francis, Inc.</u>, 489 F.3d at 844 (citing <u>Clay v. Holy Cross Hosp</u>, 253 F.3d at 1005). The ultimate burden to prove intentional discrimination rests with Ms. Serednyj. <u>Clay v. Holy Cross Hospital</u>, 253 F.3d at 1005.


a

To be similarly situated, comparators must be comparable to Ms. Serednyj in all material respects. <u>Crawford v. Indiana Harbor Belt RR Co.</u>, 461 F.3d 844, 846 (7th Cir. 2006). Material points of comparison involve pregnancy, Beverly Healthcare's HR-305 policy, supervision under Ms. Mount and HR Division manager Connie Rebey, *see* <u>Radue v. Kimberly-Clark Corp.</u>, 219 F.3d 612,

617-618 (7th Cir. 2000), injuries and conditions acquired on or off the job, and disability within the meaning of the ADA.

Ms. Serednyj argues that there are similarly-situated nonpregnant employees receiving better treatment than she did, as well as disabled or pregnant employees being treated differently than she was. Ms. Serednyj hasn't produced enough evidence to establish a similarly situated comparator who is being treated better than she was. Ms. Serednyj didn't provide personnel files at the depositions of Ms. Mount, Mr. Christe, or Ms. Rebey. This left Mr. Christe to offer vague, unsupported statements about other employees. When asked questions about employees working at Golden Living, Ms. Mount often responded "I don't remember" or "I would have to see their personnel file first." With its summary judgment motion, Beverly Healthcare submitted Ms. Mount's affidavit with exhibits from personnel files fleshing out (and not contradicting) her own testimony and rebutting Ms. Serednyj's vague assertions.

Mr. Christe testified that the current activity director receives assistance from Mr. Christe and others at Beverly Healthcare, much as Ms. Serednyj did before she requested accommodation. This does nothing more than establish that Beverly Healthcare employees continue to help each other when able. There is no showing that the current activity director has formally requested and received an accommodation for a non-work related injury or condition.

Mr. Christe testified that Golden Living would assist other employees who were hurt for whatever reason. For example, a woman named "Bonnie" who was

old enough to be Mr. Christe's mother was a CNA who allegedly received assistance in transporting and transferring patients. Ms. Serednyj doesn't identify who this "Bonnie" is. Ms. Mount's affidavit states that the only employee at Golden Living with the first name of "Bonnie" who worked for Beverly Healthcare since 2004 to the present is fifty-six years old and never asked for or received an accommodation.

Susan Eckman, a CNA and LPN at Golden Living while Ms. Serednyj worked there is said to have had breast augmentation surgery and been provided light duty work after her surgery. Ms. Serednyj admitted in her deposition that she had no personal knowledge of this, but rather heard it from Gina Sizemore, a friend who also worked at Golden Living. This is inadmissible hearsay. Moreover, Ms. Mount's affidavit asserts, without rebuttal, that Ms. Eckman never sought nor received an accommodation for a breast augmentation.

Carol Williams is said to have been a CNA at Golden Living who was being treated for L3, L4 disc degeneration and to have been given significant lifting, bending and twisting restrictions by her doctor, yet continued working for Golden Living until she resigned. The record doesn't establish that Ms. Williams continued working for Golden Living. Ms. Mount stated in her deposition that without seeing her personnel file she didn't know for certain how long she worked at Golden Living. Ms. Mount's affidavit states, without rebuttal, that Ms. Williams was an LPN (not a CNA) at Golden Living, and never received accommodation for her non-work related injury. Ms. Williams took medical leaves of absence in 2005

and 2006 for her back injuries, and sustained two work-related injuries in 2006 and 2007. Since Ms. Williams sustained work-related injuries, any accommodations she might have received (and the court can't say what those were based on Ms. Serednyj's testimony) would have been pursuant to Beverly Healthcare's HR-305 policy.

Pam Seibert was a speech therapist at the Golden Living facility while Ms. Serednyj worked there. She was obese, could walk only for short periods before becoming quite out of breath and used a "rollator chair." Ms. Seibert allegedly was terminated in 2008 shortly after producing a note requiring her to use a rolling walker and to be allowed to take breaks at her desk. Ms. Seibert was an employee for Aegis Therapies, which has the same parent company as Beverly Healthcare Living but applies different policies to its employees. Ms. Seibert isn't a comparator for Ms. Serednyj under the PDA because Ms. Serednyj alleges Ms. Seibert was disabled, and the ADA presumably would apply if she were disabled. Moreover, Ms. Mount had no knowledge nor any involvement in decisions about Ms. Seibert's employment, especially regarding accommodations. Aegis HR Director Andrew Sholly submitted an affidavit about Ms. Seibert, and Ms. Mount doesn't speak about Ms. Seibert in her own affidavit because Ms. Mount had no authority over Ms. Seibert. Mr. Sholly states Aegis provides occupational, physical and speech therapy services, that Aegis has separate policies and procedures governing its employees, and that Aegis doesn't operate long-term care facilities. Nothing indicates that Ms. Mount or Beverly Living had any decisionmaking

authority over Ms. Seibert, nor that Aegis had any decisionmaking authority over Ms. Mount or Ms. Serednyj. Ms. Seibert is not a valid comparator to Serednyj.

Jessica Sherwood is said to have been provided light duty after hurting her arm in the Alzheimer's unit. Ms. Sherwood isn't a comparator to Ms. Serednyj because any accommodation she received would have been pursuant to her work-related injury, and Ms. Serednyj doesn't dispute this.

Amy Dolbeare was a CNA said to have been discharged when having pregnancy complications. Ms. Serednyj admitted that she has no personal knowledge of Ms. Dolbeare and that Gina Sizemore told her about Ms. Dolbeare. This is inadmissible hearsay. Additionally, Ms. Mount states in her affidavit, without rebuttal, that Ms. Dolbeare never worked at the Golden Living facility.

Gina Sizemore worked as a CNA, and was pregnant around the same time as Ms. Serednyj. Ms. Sizemore and Ms. Serednyj were friends and continued to talk after Ms. Serednyj was terminated. Around seven months into her pregnancy, Ms. Sizemore's physician placed her on restricted duties and Ms. Sizemore had to take FMLA leave because Ms. Mount wouldn't allow her to work after these restrictions were imposed. Her FMLA leave expired and she was terminated instead of being allowed to return to work. All Ms. Serednyj knew of Ms. Sizemore's situation was based on what Ms. Sizemore told her, which is hearsay. Moreover, even with the hearsay, Ms. Serednyj's testimony seems to indicate that Ms. Sizemore was still on restricted duty from her doctor when her FMLA leave ran out. In any event, based on the record, Ms. Sizemore is not an example of an

employee receiving more favorable treatment than Ms. Serednyj, but is rather the exact opposite: an example of an employee receiving the same treatment as Ms. Serednyj. Ms. Serednyj's attorney tried to get Ms. Mount to admit that Ms. Sizemore could have worked after her doctor put her on restrictions, but no evidence rebuts Ms. Mount's statement that to the best of her knowledge Ms. Sizemore couldn't work after her doctor's restrictions were imposed (she wouldn't state this with 100 percent certainty when not allowed to review Ms. Sizemore's file).

Finally, Ms. Serednyj's friend, Mr. Christe, testified that employees who got pregnant tended to disappear after becoming pregnant. This unsubstantiated assertion is belied by Ms. Serednyj's statement that she knew of at least three women at the Golden Living facility who had become pregnant, worked through their pregnancies, and returned to work after giving birth. Dawn Mount confirmed this, stating that "Since January 1, 2004 to the present, there have been four Beverly employees who have worked through their pregnancies, took [sic] a leave of absence, and returned to work, including Jennifer Kisela, Constance Caradine, Joy Roman, and Brittany Ouellette."

Ms. Serednyj hasn't presented any comparators to support her claim of pregnancy discrimination.

b

Even had Ms. Serednyj had made out a *prima facie* case of discrimination, she hasn't shown that a rational jury could find pretext. Pretext simply means that Beverly Healthcare's stated reason for its treatment of Ms. Serednyj must be a lie and not the true reason for her treatment. Griffin v. Sisters of Saint Francis, 489 F.3d at 845; *see also* Forrester v. Rauland-Borg Corp., 453 F.3d 416, 418 (7th Cir. 2006) ("[T]he question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the sated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason.").

The pretext analysis doesn't go beyond the question of the subjective truth of the employer's stated reason into the objective sufficiency of the stated reason. *See generally* Forrester v. Rauland-Borg Corp., 453 F.3d 416 (7th Cir. 2006) (holding that question of whether stated reasons were sufficient to motivate adverse employment action is no longer part of pretext analysis); *see also* Clay v. Holy Cross Hospital, 253 F.3d at 1005 ("On the issue of pretext, our only concern is the honesty of the employer's explanation" (citation omitted)). Because the issue is the honesty of Beverly Healthcare's stated reason for its treatment of Ms. Serednyj, it is precisely the truth of this stated reason that Ms. Serednyj must squarely rebut. *See* Clay v. Holy Cross Hospital, 253 F.3d at 1007.

Ms. Serednyj argues that Beverly Healthcare indicated on her Indiana welfare form that she was fired — a switch, as Ms. Serdnyj sees it, from its story that she quit. She argues that Beverly Healthcare tried to come up with reasons

to fire her after she formally asked for accommodation. Finally, she argues that Beverly Healthcare accommodated employees who weren't pregnant and not disabled. These arguments are addressed in other parts of this opinion, and none of these arguments squarely rebuts that Beverly Healthcare was honest in stating that it treated her as it did because it was simply applying its HR-305 policy. Ms. Serednyj repeatedly said in her deposition testimony that Beverly Healthcare's reason for her treatment was its policy of not accommodating non-work related injuries or conditions. Beverly Healthcare's stated reason to Ms. Serednyj for its actions both then and now was that it was applying its policy. The policy might be unfair and the employment practice might have been unwise, but this record contains nothing on which it could be found that Beverly Healthcare's reason was anything other than what it has claimed.

Beverly Healthcare indicated to the Porter County Division of Family and Children that Ms. Serednyj was "fired." Beverly Healthcare's employees testified that Ms. Serednyj had quit. Ms. Serednyj takes the position that she was fired. Ms. Serednyj's testimony on this is somewhat ambiguous, because her attorney carefully used the term "terminated" in her deposition and Ms. Serednyj carefully stated that Ms. Mount told her she would have to "let her go." These terms are ambiguous in this record because they could fit either the theory that Ms. Serednyj was "fired" or that she felt pressured to quit her job such that she finally said, as others testified, "I'm out of here." Regardless of exactly what happened,

Beverly Healthcare doesn't take the position before the court that Ms. Serednyj quit.

Ms. Serednyj argues that this conflict in the story proves pretext. Assuming Beverly Healthcare was "lying" about whether Ms. Serednyj quit or was fired, that "lie" wouldn't go to the issue here. Assuming that Ms. Serednyj was fired, which this court accepts for purposes of this summary judgment, Beverly Healthcare's story as to why she was fired is fully consistent without any doubt raised throughout the record, including Ms. Serednyj's own testimony: the policy was simply being applied and nothing in the record calls that explanation into question.

B

Ms. Serednyj argues that her pregnancy complications rendered her disabled under the Americans with Disabilities Act, so Beverly Healthcare should have granted her requested accommodations for light duty because these accommodations were reasonable. Beverly Healthcare argues that Ms. Serednyj was never disabled for purposes of the ADA, and that even if she was disabled they offered her a leave of absence, which they argue was a reasonable accommodation and which they argue she refused.

As already discussed, the PDA doesn't cover a woman suffering pregnancy complications when she requests accommodations unless accommodations are provided to similarly situated non-pregnant employees. The ADA might not cover

a woman due to the low impact and/or relatively brief nature of her complications, as will be discussed shortly. If such a woman doesn't qualify for FMLA leave to protect her job while she is temporarily ill, she might very well fall into a blind spot in the statutory scheme created by Congress. Ms. Serednyj is such a woman lost in the gaps in the law for pregnant women.

Ms. Serednyj can proceed on a disability discrimination claim through the direct or indirect methods. <u>Kampmier v. Emeritus Corp.</u>, 472 F.3d 930, 937 (7th Cir. 2007). To make out a *prima facie* case under the indirect method, she must show (1) she was disabled within the meaning of the ADA, (2) she was meeting her employer's legitimate expectations, (3) she was subject to an adverse employment action, and (4) similarly situated employees received more favorable treatment. <u>Id.</u> For the reasons already stated, Ms. Serednyj doesn't present comparators that would help her under the indirect method. Pam Seibert, the closest comparator under the disability claim, was employed by Aegis and so had different superiors and policies under which she operated. Additionally, whether Pam Seibert is a comparator proves irrelevant if Ms. Serednyj wasn't disabled within the meaning of the ADA.

So Ms. Serednyj's better hope is to proceed under the direct method, meaning she must first establish that she was "disabled" within the meaning of the ADA. The Americans with Disabilities Act prohibits employment discrimination against a "qualified individual" with a "disability." 42 U.S.C. § 12112(a) (West

2005).[2] A "disability" is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. 12102(2) (West 2005). A "qualified individual" is someone "with a disability who, with or without reasonable accommodation, can perform the essential functions" of the job the person holds. 42 U.S.C. 12111 (West 2005). Ms. Serednyj argues all three definitions of disability.

Terminating an employee because of illness isn't necessarily the same thing as terminating an employee because of disability. The ADA only protects a person who is disabled within the meaning of the ADA, and this excludes many illnesses. *See* Moore v. J.B. Hunt Transport, Inc., 221 F.3d 944, 950 (7th Cir. 2000) ("If Mr. Moore's condition does not rise to the level of a disability as defined by the ADA, then he cannot prevail on his claim even if Hunt terminated him expressly because of his condition."); Christian v. St. Anthony Med. Ctr., Inc., 117 F.3d 1051, 1053 (7th Cir.1997) ("The Act is not a general protection of medically afflicted persons.... If the employer discriminates against them on account of their being (or being believed by him to be) ill, even permanently ill, but not disabled, there is no violation.").

---

[2] Congress amended the ADA in 2008, to go into effect on January 1, 2009. Congress didn't indicate any intention for the ADA amendments to apply retroactively, and since the events in this case occurred in 2007 the court applies the pre-amendment version of the ADA. *See* Fredricksen v. United Parcel Service Co., 581 F.3d 516, 521 n.1 (7th Cir. 2009).

No federal court of appeals has addressed whether complications from pregnancy may constitute a disability under the ADA. Some district courts have concluded that the ADA doesn't cover pregnancy complications because Title VII prohibits discrimination on the basis of pregnancy and related medical conditions, obviating the need for the ADA to cover pregnancy complications. *See* <u>Villarreal v. J.E. Merit Constructors, Inc.</u>, 895 F.Supp. 149, 152 (S.D. Tex. 1995); <u>Tsetseranos v. Tech Prototype, Inc.</u>, 893 F.Supp. 109, 119 (D.N.H. 1995). The PDA doesn't require accommodations, however, whereas the ADA requires accommodations for qualified individuals. Therefore, a woman claiming pregnancy discrimination for failure to accommodate may very well not be covered by the PDA or the ADA, as in Ms. Serednyj's case.

A sounder approach to dealing with pregnancy complications under the ADA taken by many district courts is to simply follow the elements presented in the ADA's statutory language and decide (1) whether the alleged complications constituted a physical impairment, and (2) whether the impairment substantially limited a major life activity. *See* <u>Gabriel v. City of Chicago</u>, 9 F.Supp.2d 974, 981 & n.5 (N.D. Ill. 1998) (gathering cases). This approach fits the rule that "whether or not a medical condition rises to the level of a disability is to be made on an individualized case-by-case basis." <u>Kampmier v. Emeritus Corp.</u>, 472 F.3d 930, 938 (7th Cir. 2007).

A physical impairment includes, among many other things, any physiological disorder affecting the reproductive system. 29 C.F.R. § 1630.2(h)(1). Pregnancy is not, by itself, a physical impairment. 29 C.F.R.App. § 1630.2(h); <u>Gabriel v. City of Chicago</u>, 9 F.Supp.2d at 979-980 (N.D. Ill. 1998) (gathering cases); <u>Gudenkauf v. Stauffer Communications, Inc.</u>, 922 F.Supp. 465, 473 (D. Kan. 1996). But some courts have found that unusual complications from pregnancies may be physiological disorders qualifying as impairments. *See* <u>Darian v. University of Massachusetts Boston</u>, 980 F.Supp. 77, 85-86 (D. Mass. 1997) (gathering and distinguishing cases in which pregnancy-related symptoms were not disabilities under the ADA); <u>Hernandez v. City of Hartford</u>, 959 F. Supp. 125, 130 (D. Conn. 1997) (holding premature labor from uterine fibroids was impairment as matter of law); *see also* EEOC COMPLIANCE MANUAL, § 902.2(c)(3), available at http://www.eeoc.gov/policy/docs/902cm.html ("Complications resulting from pregnancy, however, are impairments").

Many courts find the analysis in <u>Hernandez v. City of Hartford</u> persuasive. The <u>Hernandez</u> court distinguished the medical situation of abnormal pregnancies from normal pregnancies. Abnormal pregnancies arise from physiological disorders within the meaning of the ADA because physiological disorders are "an abnormal functioning of the body or a tissue or organ." <u>Id.</u> at 130 (quoting DORLAND'S MEDICAL DICTIONARY (27th Ed. 1988)). The <u>Hernandez</u> court noted that this fit well within the C.F.R. guidance note that "conditions, such as pregnancy,

that are not the result of a physiological disorder are not impairments." <u>Id.</u> (quoting 29 C.F.R.App. § 1630.2(h)(1)). A further refinement in the distinction is to note that complications might be normal or abnormal, and only abnormal complications might qualify as impairments. As several courts have stated, "pregnancy and related medical conditions do not, absent unusual circumstances, constitute a disability under the ADA." <u>LaCoparra v. Pergament Home Centers, Inc.</u>, 982 F.Supp. 213, 228 (S.D.N.Y. 1997) (gathering cases).

Ms. Serednyj has produced enough evidence to establish that she suffered a physical impairment from her pregnancy's complications. Ms. Serednyj was spotting and cramping, and a doctor's visit showed that her progesterone levels were low and her pregnancy risked miscarriage. The notes from Dr. Sherritt and Dr. Wiese establish that Ms. Serednyj's condition was serious, she risked losing her pregnancy, and she required bed rest for a period of almost two weeks and progesterone suppositories. The court won't jump to medical conclusions and assume without medical evidence that these conditions constitute an abnormal pregnancy, but her doctors' order for bed rest establishes she suffered an impairment. *See* <u>Gabriel v. City of Chicago</u>, 9 F.Supp.2d at 981 (court could not say that back pain, stomach pain, and premature birth were, as a matter of law, functions of a normal pregnancy, and reasonable jury could find they were physiological disorder of the reproductive system).

b

Complications that are "physical impairments" still must substantially limit a major life activity, and this is where Ms. Serednyj's ADA claim stumbles. An impairment is substantially limiting when a person is unable to perform a major life activity that the average person in the general population can perform, or is significantly restricted in such activity as compared to a person in the general population. 29 C.F.R. § 1630.2(j)(1). Factors that should be taken into account in determining whether a person is substantially limited in a major life activity are (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2); Kampmier v. Emeritus Corp., 472 F. 3d 930, 937 (7th Cir. 2007). Ms. Serednyj argues that her impairment substantially limited her major life activities of reproduction and lifting (she doesn't pursue the difficult argument that her impairment substantially limited her life activity of working).

Short-term, temporary restrictions aren't substantially limiting and don't render a person disabled under the ADA. See 29 C.F.R.App. § 1630.2(j) ("[T]emporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, appendicitis, and influenza."); Waggoner v. Olin Corp., 169 F.3d 481, 484 (7th Cir. 1999) ("Disability does not include temporary medical conditions."); Hamm v.

Runyon, 51 F.3d 721, 725 (7th Cir. 1995) ("Under the ADA, intermittent, episodic impairments are not disabilities" (quotation removed)).

Courts that have allowed pregnancy complication ADA cases to proceed beyond summary judgment have done so because the evidence on the record was sufficient to allow a rational trier of fact to find for the plaintiff under the ADA. *See* Gabriel v. City of Chicago, 9 F.Supp.2d 974, 982 (N.D. Ill. 1998) (reasonable jury could find major life activity of standing was substantially limited when back and stomach pains and swollen feet prevented standing for long periods of time for six months of a seven-month long pregnancy); Hernandez v. City of Hartford, 959 F. Supp. at 131 (summary judgment denied because genuine issue of material fact remained where impairment lasted throughout pregnancy and was controllable only through medication and where plaintiff was substantially limited in performing basic administrative tasks like answering phone calls).[3]

In Gabriel v. City of Chicago, the court specifically noted that the evidence showed that Gabriel's conditions were not intermittent or episodic, nor a "non-chronic impairment of short duration, with little or no long term or permanent impact." 9 F. Supp.2d at 983 (quoting 29 C.F.R.App. § 1630.2(j)). Gabriel's ailments went from July 1995 to January 1996 and extended beyond the

---

[3] Other courts discussing pregnancy complications under the ADA have allowed cases to proceed beyond a motion to dismiss. *See* Cerrato v. Durham, 941 F. Supp. 388, 393 (S.D.N.Y. 1996) (motion to dismiss denied because pregnancy-related conditions of spotting, leaking, cramping, dizziness, and nausea were physical impairments and fact question of extent and severity of limitations on plaintiff needed to be litigated); Patterson v. Xerox Corp., 901 F. Supp. 274, 278 (N.D. Ill. 1995) (motion to dismiss denied because severe back pain caused by pregnancy and prior back injury sufficiently alleged disability and required litigation to determine duration of condition).

time she gave birth. Gabriel v. City of Chicago, 9 F.Supp.2d at 983. The Gabriel court distinguished the plaintiff's case from those in which plaintiffs relied on pregnancy itself as a disability or as involving evidence that conditions experienced in pregnancy were not outside the normal range. Id. (gathering cases). In one case, a CNA was given lifting restrictions and told not to work more than eight hours a day, but the evidence didn't establish that these were unusual circumstances with respect to the plaintiff's pregnancy. Jessie v. Carter Health Care Ctr., 926 F.Supp. 613, 616 (E.D. Ky. 1996). In another case, the plaintiff's prior history of infertility, miscarriage, and spotting and cramping didn't establish that these conditions were chronic or resulted in long-term or permanent impact even though the plaintiff was granted a nine-month leave of absence for her complications. LaCoparra v. Pergament Home Centers, Inc., 982 F. Supp. 213, 229 (S.D.N.Y. 1997); see also Richards v. City of Topeka, 934 F.Supp. 378, 380, 382 (D. Kan. 1996) (no allegations plaintiff's pregnancy was unusual or abnormal even though she was placed on light duty by her doctor); Gudenkauf v. Stauffer Communications, Inc., 922 F.Supp. 465, 474 (D. Kan. 1996) (medical evidence of record established pregnancy was not unusual or abnormal despite morning sickness, stress, nausea, back pain, swelling and headaches); Tsetseranos v. Tech Prototype, Inc., 893 F. Supp. 109 (D.N.H. 1995) (no evidence abnormal condition of ovarian cysts had any effect on any major life activities).

The summary judgment record doesn't create a triable issue of material fact regarding the impact and duration of Ms. Serednyj's complications. Ms. Serednyj

testified clearly and at length that her condition was temporary, with her doctor allowing her to exercise again within a few months of the onset of her complications. Ms. Serednyj argues that her doctor never technically lifted her restrictions because there is no doctor's note to that effect, but she testified that her doctor orally allowed her to exercise and that she began exercising in June 2007. Ms. Serednyj went on to give birth, find a job, become pregnant again, and work through her second pregnancy without any complications. With hindsight, the evidence firmly establishes the brief nature of her condition.

Ms. Serednyj urges the court to view her condition as it was when she was terminated in March 2007. *See* Hershey v. Praxair, Inc., 969 F. Supp. 429, 433 (S.T. Tex. 1997) ("The status of plaintiff's physical impairment must be viewed at the time of her discharge, when the allegedly discriminatory act took place."). The guidance language of the C.F.R. speaks of the duration or expected duration, impact or expected impact of an impairment. 29 C.F.R. § 1630.2(j)(2), and isn't as limiting as Ms. Serednyj suggests. Viewing Ms. Serednyj's condition at the time of her impairment, the summary judgment record would leave the trier of fact to guess about the expected severity, duration and impact of her complications. The summary judgment record contains no evidence regarding what was expected of her complications at that time, and so presents no triable issue of material fact about whether the expected severity, duration and impact of her condition rendered her disabled at the time of her termination.

Ms. Serednyj can be no more successful under the record of disability theory than she would be under the substantially limiting impairment theory because she "must again show that her impairment substantially limits one or more major life activities." Kampmier v. Emeritus Corp., 472 F.3d 930, 938 (7th Cir. 2007). Because she hasn't shown this, her record of disability theory can't succeed, either.

To establish that Beverly Healthcare "regarded" her as disabled, Ms. Serednyj must show either that (1) her employer mistakenly believed she had an impairment that substantially limited a major life activity or (2) her employer mistakenly believed that an existing impairment, which is not actually limiting, did substantially limit a major life activity. Brunker v. Schwan's Home Service, Inc., 583 F.3d 1004, 1008 (7th Cir. 2009) (citations omitted). "In other words, the employer must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." Neese v. Julian Nordic Const. Co., 405 F.3d 638, 641 (7th Cir. 2005) (quotations and citations omitted).

The "regarded as" prong protects qualified nondisabled persons from being precluded from employment because of a misperception of disability. *See* Moore v. J.B. Hunt Transport, Inc., 221 F.3d 944, 954 (7th Cir. 2000) (discussing 29

C.F.R.App. § 1630.2(l) and stating "[I]f an individual can show that an employer or other covered entity made an employment decision because of a perception of disability based on "myth, fear or stereotype," the individual will satisfy the "regarded as" part of the definition of disability").

Ms. Serednyj can't prevail on the "regarded as" theory unless she is arguing that she wasn't actually disabled but nonetheless was regarded as disabled. Her entire case is based on the theory that she was disabled and her employment with Beverly Healthcare ended for that reason. Her "regarded as" case is developed much less fully.

No reasonable trier of fact could find on this record that Beverly Healthcare mistakenly believed Ms. Serednyj was disableed, and Ms. Serednyj hasn't made any showing of Beverly Healthcare's actions being a stereotype of pregnant women with complications. Beverly Healthcare responded to a condition that Ms. Serednyj made known to Beverly Healthcare and to doctor's notes restricting Ms. Serednyj to bed rest and then to light duty work. Beverly Healthcare's valid impression that Ms. Serednyj had an illness that prevented her from performing all of her job functions (essential or otherwise) as activity director doesn't violate the law. *See* Moore v. J.B. Hunt Transport, Inc., 221 F.3d at 954-955 (noting employer's actions were in response to specific restrictions identified by plaintiff's medical doctor, were not based on myth, fear or stereotype, and were in response to belief that employee who couldn't tolerate cold, damp conditions simply couldn't perform his specific job anymore).

C

Finally, Ms. Serednyj argues briefly that Beverly Healthcare retaliated against her. She argues that after she filed her formal request for accommodation on March 21, 2007, Golden Living refused to accommodate her and began searching for reasons to fire her. Ms. Mount wrote on a note "office mess, attendance, overall organization." That note has the dates 3/23/2007 and 3/26/2007 written on it. She argues also that although Golden Living maintains that she quit, they indicated on her state welfare forms that she was fired, which could have jeopardized her receipt of benefits.

Similar to Title VII claims, there are direct and indirect methods of showing retaliation. To set out a *prima facie* case of retaliation under the indirect method, Ms. Serednyj must show (1) she engaged in statutorily protected activity, (2) she was performing her job according to her employer's legitimate expectations; (3) despite meeting those expectations, she suffered a materially adverse action; and (4) she was treated worse than a similarly situated employee who didn't engage in statutorily protected activity. <u>Firestine v. Parkview Health System, Inc.</u>, 388 F.3d 229, 233 (7th Cir. 2004). Once a *prima facie* case is set out, the burden-shifting, pretext analysis takes place. <u>Id.</u>

Ms. Serednyj's arguments falter at the third element under either the direct or indirect methods: she didn't suffer any materially adverse actions from Beverly Healthcare. Ms. Serednyj expressly admitted in her deposition that her employment ended on March 13, 2007, and no evidence in the record suggests

otherwise. Ms. Serednyj further admitted that when she submitted her March 21 letter formally requesting accommodations she was no longer a Beverly Healthcare employee. She doesn't explain why Beverly Healthcare would begin to look for reasons to fire her when she was already terminated. If anything, the evidence shows that Ms. Mount took Ms. Serednyj's request seriously, contacting Division Human Resources Manager Connie Rebey to discuss the request, along the lines of the HR-305 policy. Ms. Mount followed up with Ms. Serednyj even though she didn't have to. This doesn't show retaliation.

Ms. Serednyj argues that Beverly Healthcare fired her even though she had paid leave she could still take. The leave was paid to Ms. Serednyj, *see* Barnett Dep. at 34-35, and Ms. Serednyj doesn't explain how paying the leave owed to a terminated employee is a retaliatory, "materially adverse" action taken against a former employee.

Ms. Serednyj also argues that her welfare application could have been negatively affected because Beverly Healthcare indicated on her Earnings Information Request form that she was "fired." This argument creates a dissonance in the record. Ms. Serednyj maintains she was fired. Beverly Healthcare employees maintained in their deposition testimony that she quit, but Beverly Healthcare doesn't take that position in its summary judgment motion (rather, Beverly Healthcare argues that whether she quit or was fired is immaterial to this summary judgment). A post-employment action by an employer can be retaliatory, *see generally* <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337 (1997) (holding

unanimously that term "employees" in antiretaliation provision of Title VII includes former employees), but Beverly Healthcare reported what Ms. Serendyj contends is true. Further, Ms. Serednyj testified to receiving her welfare benefits, *see* Serednyj Dep. Exh. 8, and her claim that Beverly Healthcare's action "might have" jeopardized her benefits is only a hypothesis.

IV

The court GRANTS Beverly Healthcare Healthcare's motion for summary judgment in full [Doc. No. 34].

ENTERED:   April 16, 2010

         /s/ Robert L. Miller, Jr.
Robert L. Miller, Jr., Chief Judge
United States District Court